## Yenawine v. Tycrete-Concrete Products Co.

(Decided October 9, 1914.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

Contracts—Fraud—Rescission—Evidence.—In an action by plaintiff to rescind the sale and recover the purchase price of stock sold to him by the president of a company through alleged false representations as to the condition of the company's property and business, evidence examined and held to sustain the finding of the chancellor that plaintiff was not induced to purchase the stock by fraud or misrepresentation.

R. C. KINKEAD and H. H. NETTLEROTH for appellant.

BURNETT, BATSON & CARY for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

This is a suit by plaintiff, John W. Yenawine, against defendants, Tycrete-Concrete Products Company and its president, Claude D. Moody, to rescind a sale of stock which he had purchased from the company, and to recover the amount of the purchase price, on the ground that he was induced to purchase the stock by fraudulent representations. A recovery was denied by the chancellor and plaintiff appeals.

The petition charges that Moody made the following misrepresentation of facts: (1) The business and affairs of the company were in a sound and prosperous condition; (2) the company then had on hand contracts which would yield large profits to the company; (3) the capital stock of the company was of the value of at least $100 a share.

It appears that Moody had been making a study of the concrete business, and to this end had visited several

plants in different parts of the country. In the spring of 1911 he organized the Tycrete-Concrete Products Company with an authorized capital stock of $35,000. $15,000 worth of stock was subscribed, and the money paid in. The corporation then proceeded to buy a lot and erect buildings and machinery for the purpose of making tile blocks, monuments, burial caskets, etc. Moody himself had subscribed for $8,000 worth of stock.

According to Yenawine's testimony he was introduced to Moody by one Vaughn. Moody wanted a bookkeeper and office man who would take an interest in the company. He invited Yenawine to go to the plant, and explained to him the workings of the different machines and appliances for making concrete. Moody stated that the company had not been able to make much headway owing to the fact that its superintendent was inefficient and incompetent, but that in the month of October the company had obtained an expert concrete man by the name of Wightman. Thereupon Yenawine asked for a financial statement of the condition of the company. This was furnished by Moody. The statement was prepared by someone else. This statement only showed the book values of the building lot and machinery and other items. It did not show the real value. The statement did show, however, that there was a deficit of about $2,000, and that the stock was worth only about 87 cents. Moody stated, however, that this deficit could more than be made up by valuable rights which he had secured, which rights Yenawine claims were of no value. About December 15th, Yenawine agreed to subscribe for $5,000 worth of stock. He at the same time was appointed bookkeeper of the company, and given a salary of $150 a month. At that time he paid about $1,000 on his subscription. On January 5th he paid $100, on January 12th $400, and the balance on January 23rd. He would not have subscribed for the stock had it not been for the statements made by Mr. Moody, who told him that they were then in a position to make concrete cheaper than anybody else, and that the profits of the concern would be very large. Along in March of the following year, he investigated the assets of the concern, and found that the buildings and machinery were worth a great deal less than the statement furnished him by Moody showed. In his opinion, the statement was false, because it failed to show the actual value of the building. Wightman, the superintendent, testified that the building was not equipped to be run at

a profit; that certain changes in the machinery had to be made; that the concern could not possibly make a profit at the prices at which he was required to sell the products.

Moody admits having investigated the concrete business, and having great confidence in the company making handsome profits. Mr. Wightman had been highly recommended to him, and he had every confidence in him. He afterwards ascertained that Wightman was inefficient and neglected the business. Had the business been properly run, it would have been a success. So far as he knew, the statement which he furnished plaintiff was true. He had it prepared by an expert accountant. He made no representations to plaintiff as to the value of the stock, but he believed that any deficit could be made up by future profits if the business was properly handled. He also stated that he did have certain contracts which were very valuable, and that these contracts were more than sufficient to off-set the deficit shown by the statement which he furnished plaintiff. At the same time he explained to plaintiff that the buildings and machinery had probably cost more than they should have cost, but that even these items could be off-set if they could sell their treasury stock and conduct the business as it should be conducted. He not only had every confidence in the undertaking, but had invested $8,000 of his own money prior to his meeting plaintiff, and had subsequently invested $2,000 more. Along in April the business was sold because it could not be conducted at a profit, under its then management. The purchasers agreed to pay the debts of the concern. After the business was sold, the new concern conducted it at a profit. Other witnesses testified to the incompetency of Wightman, and to the fact that he neglected the business of the concern. Other witnesses corroborated Moody in his statement that he advised plaintiff that more money had been spent on buildings and machinery than was necessary.

It also appears that plaintiff himself was present on January 18th at a meeting of the board of directors, when the fact of the excessive cost of the buildings was discussed and fully considered.

The chief complaint of the statement furnished by Moody to plaintiff is that it was false because it failed to show the real values of the buildings and machinery. Inasmuch, however, as the buildings had been but re-

cently erected, and the machinery installed, and in view of the further fact that it is not customary for business concerns to charge off anything for depreciation so soon after the erection or installation of the machinery, the fact that the statement shows book values instead of real values cannot be regarded as a fraudulent representation. Furthermore, the weight of the evidence tends to show that plaintiff himself was informed of the fact that the buildings and machinery were not worth as much as the statement showed.

As the record is voluminous, we deem it unnecessary to set out the evidence at length. In our opinion, the evidence on all disputed questions of fact fully sustains the finding of the chancellor. Reduced to its final analysis, the case is simply this: Plaintiff was a business man of experience, and after visiting the plant and hearing Moody talk, he caught some of Moody's enthusiasm, and desired to become a stockholder. He had every opportunity to investigate the plant, and was not deceived as to any past or present conditions. He knew that the plant was in its infancy, and its success would depend on its selling its treasury stock and on its proper management. He knew that it had done and was doing very little business, that its stock was not worth par at the time he subscribed for it, and that unless it sold its treasury stock and secured and handled a large amount of business at a profit, the expenses of conducting the concern would soon eat up its assets. After talking with Moody he had faith in the ultimate success of the concern. Not only he, but other stockholders who had theretofore invested considerable money, placed more money in the concern. Had the treasury stock been sold and the concern properly conducted, we doubt not that it would have been a success. The fact that the new concern which took over its assets is now making a profit, tends to establish this fact. He lost his money and so did Moody and the other stockholders. Upon a consideration of the whole record we fail to see any substantial reason for holding that the conditions under which he purchased his stock differed in any material respect from those under which the other stockholders made their purchases. It is simply a case of a venture in which they all had faith, and which turned out to be unsuccessful.

Judgment affirmed.